E-FILED
Thursday, 20 September, 2007  04:21:21 PM
Clerk, U.S. District Court, ILCD

## IN  THE  UNITED  STATES  DISTRICT  COURT

## CENTRAL  DISTRICT  OF  ILLINOIS - SPRINGFIELD  DIVISION

| | | |
|---|---|---|
| PAMELA  K.  MATTINGLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-3287 |
| | ) | |
| MICHAEL  J.  ASTRUE, | ) | |
| COMMISSIONER  OF | ) | |
| SOCIAL  SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

CHARLES  H.  EVANS,  U.S. Magistrate Judge:

Plaintiff  Pamela  K.  Mattingly  appeals  from  the  Commissioner's final  decision  to  deny  her  application  for  Supplemental  Security Income  (SSI).    42 U.S.C. §§ 416(I),  423.    The  parties  consented, pursuant  to  28 U.S.C. § 636(c),  to  have  this  matter  proceed  before  this Court.    Consent  to  Proceed  Before  a  United  States  Magistrate  Judge, and  Order  of  Reference (d/e 14).    This  Court  has  jurisdiction  to  hear this  appeal.    42 U.S.C. §§ 405(g),  1383(c).    For  the  reasons  set  forth

1

below, the Court affirms the Commissioner's decision.

## STATEMENT OF FACTS

Paula Mattingly was born on April 15, 1962.  She has a tenth grade education.  She worked previously as a cook, food prep worker, cashier, laundry worker, housekeeper, telemarketer, and book binder. Certified Record of Proceedings (d/e 10) (hereinafter "R."), at 13. She last worked in September 2004.  Mattingly filed for SSI benefits on November 19, 2004.  She claimed that her disability began on September 14, 2004, due to depression, migraines, asthma, and high blood pressure.

Mattingly sought treatment for these conditions beginning in 1988.  From 1988 to 1996, Douglas Byers, M.D., treated Mattingly for headaches, depression, and breathing difficulty. R. 155-74. Mattingly's medical records show no medical care for these conditions from 1996 to 2003.  Between January and October 2003, Mattingly was treated by Fauquier Medical Associates in Bealeton, Virginia, for depression and breathing difficulties.[1]

Between January and September 2004, Gloria Dyocco, M.D.,

---

[1]Mattingly briefly lived in Virginia at this time.

treated Mattingly for breathing difficulties and hypertension. Mattingly had smoked two packs of cigarettes a day for 18 years and had a history of alcohol dependance.  R. 179-80.   In July 2004, a chest x-ray showed no acute abnormalities and an MRI of her brain showed non-specific findings which were felt to be most likely to represent  incidental chronic small ischemic changes. R. 186-87.  In August  2004, Dr. Dyocco prescribed  asthma medicines, nicotine patches,  a  low-cholesterol  diet, and  an  exercise  program. R. 181.

From  October  2004 to  June  2005,  Brian  J.  Cady,  M.D.,  treated Mattingly for depression, hypertension and breathing problems. R. 190-96, 234-43.  He prescribed Lexapro for depression.   Mattingly asked for Lexapro;  she  had  previously  taken  Lexapro  several  years  earlier.  In March  2005,  a  chest  x-ray showed mild  chronic  changes  and  no acute abnormalities.    Mattingly  asked  for  increases  in  her  dosages  of Lexapro  in  April  and  June  2005.   In  June  2005,  Dr.  Cady refused to increase her Lexapro dosage until Mattingly quit smoking. She did not visit  Dr.  Cady  thereafter.   R. 238.

From  January  2005  to  January  2006,  Mattingly  was  treated  by Claude  Fortin,  M.D.,  for  her  migraines.   Dr.  Fortin  instructed

Mattingly to quit smoking and eliminate caffeine from her diet.  He also prescribed Topamax for her migraine headaches.  R. 288.  At her March 2005, appointment, Mattingly indicated to Dr. Fortin that the medicine had improved her headaches, but had not taken care of them completely.  Mattingly's migraines were worse in July 2005, but in October 2005, she reported no severe migraines since starting her medication.  Dr. Fortin assessed that her migraines were controlled by medication.  R. 292-95.

From September 2005 to January 2006, Plaintiff was treated by the Montgomery County, Illinois, Health Department, Division of Mental Health.  She saw various health care professionals, including Dr. Sarma, M.D.[2]  She was diagnosed with anxiety, depression, and alcohol dependence.  At her attorney's request, Dr. Sarma filled out pre-printed forms regarding whether Mattingly's condition met various Listings in the Social Security regulations (Listings).  The Listings set forth descriptions of medical conditions that are severe enough to render a person disabled without regard to his or her age, education,

---

[2]The Court was unable to find Dr. Sarma's first name in the record.  Mattingly indicates in her testimony at the evidentiary hearing that Dr. Sarma is a woman.  R. 371.

4

or work experience.   20 C.F.R. Part 404 Subpart P, Appendix 1.   In checking the boxes on the forms, Dr. Sarma opined that Mattingly's condition did not meet the Listing for schizophrenia, paranoid and other psychotic disorders, but did meet the Listings for affective disorders and anxiety related disorders.   Dr. Sarma opined that Mattingly had marked restrictions on activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace.   She also opined that Mattingly had one or two episodes of decompensation, each of extended duration.  R. 269-80.[3]

As part of the evaluation of her application for SSI benefits, Mattingly was sent to several health care professionals for consultative examinations.   In February 2005, Dolores S. Trello, Psy.D., performed a consultative examination.   She diagnosed Mattingly with depressive disorder with a history of alcohol abuse. Dr. Trello opined that Mattingly had a global assessment of functioning (GAF) of 50, with

---

[3]The Record of Proceedings also includes medical records from Dr. Sarma that were presented to the Appeals Council, but not the ALJ.  R. 316-59.  These records will not be considered in reviewing the decision of the ALJ.  See Eads v. Secretary of Health and Human Services, 983 F.2d 815, 817 (7th Cir. 1993).

a serious impairment in vocational functioning.    R. 200.

In March 2006, Stephen G. Vincent, Ph.D., performed a consultative examination.  He prepared a written summary of his examination in which he diagnosed Mattingly with major depression and panic disorder. R. 309-12.    Dr. Vincent appended to his written summary a pre-printed form in which he checked various boxes to indicate his opinions concerning Mattingly.    In doing so, Dr. Vincent opined that Mattingly had slight difficulties understanding and remembering and carrying out short, simple instructions, and moderate difficulties understanding and carrying out detailed instructions and making judgments on simple work-related decisions. Dr. Vincent also opined that Mattingly had moderate difficulties: (1) interacting with the public, supervisors, and co-workers; and (2) responding appropriately to work pressures and changes in routine work settings.  R. 313-14.

In March 2006, Vittal Chapa, M.D., performed a physical examination at the request of the Administrative Law Judge (ALJ).  Dr. Chapa checked boxes in a pre-printed form to set forth his finding.  In doing so, he opined that Mattingly had no physical restrictions other than: (1) occasional limitations on climbing, balancing, kneeling, crouching,

crawling, and stooping; and (2) some limitations on exposure to temperature extremes, dust, humidity, fumes, odors, and chemicals. <u>R.</u> 307-08.

Finally, two physicians reviewed Mattingly's medical records and rendered opinions without examining Mattingly. Carl Hermsmeyer, M.D., opined on Mattingly's mental limitations. Dr. Hermsmeyer checked boxes on a pre-printed form to set forth his opinions based on his review of Mattingly's medical records. In doing so, Dr. Hermsmeyer opined that Mattingly suffered from an affective disorder and behavioral changes associated with substance abuse. He also opined that Mattingly had mild limitations on her activities of daily living and moderate limitations on her ability to maintain social functioning, concentration, persistence, or pace. Dr. Hermsmeyer also checked boxes to indicate that Mattingly was moderately limited in her ability to understand, remember, and carry out detailed instructions. Otherwise, he marked no other boxes to indicate any other limitations. At the end of the form, he wrote, "Although the claimant may have problems with understanding, remembering and the ability to carry out detailed instructions, the claimant retains the mental capacity to perform simple one- and two-

step tasks at a consistent pace." R. 218.

George Andrew, M.D., reviewed Mattingly's medical records to evaluate Mattingly's physical limitations. He opined that her physical impairments or combination of impairments were non-severe. He stated that she suffered from asthma and high blood pressure, but that those conditions were controlled with medication. R. 220.

The hearing before the ALJ occurred on January 25, 2006. Mattingly and vocational expert Barbara Myers testified. Mattingly was represented by counsel at the hearing. Mattingly testified that she had 20 years experience in retail as a cashier. R. 369. Mattingly testified that in 2003 and 2004, however, she worked various jobs for short periods ranging from a few days to two or three months. These included food prep work at a pizza parlor, a cashier at various retail stores, and a housekeeper. She testified that she stopped working these jobs because of either her depression or migraine headaches. R. 366-69.

Mattingly testified that she believed she could not work currently because of her depression. She said, "I can't face the public. I just can't deal with things. I'm very forgetful. I can't concentrate, lots of things. My nerves. I can't handle stress, pressure. The medicine I'm on makes

me drowsy, tired." R. 370.  She was on Lexapro and a nerve tranquillizer called Geodon.   The Geodon made her drowsy so that she could not drive.   R. 371.

Mattingly testified that she had difficulty going to sleep at night. She remained awake as late as 3:00 a.m. if she did not take a sleeping pill. She then typically stayed in bed most days until noon or 1:00 p.m.   When asked by the ALJ what she did after she got up, Mattingly replied, "Mope." R. 379.   She stated that she did not eat.   She said that in four months her weight dropped from 173 pounds to 143 pounds.   She testified that she left the house to visit the doctor, to go to the grocery store, and to go to her eldest daughter's house to play with her grandchildren.  R. 381, 389.  She did not read much because she could not concentrate.   She sometimes watched half-hour situation comedies on television, but she could not sit still long enough to watch a movie.

Mattingly testified that she took care of her personal hygiene and dressed herself, although she testified that she usually just wore sweat pants around the house.  She testified that she lived with her youngest daughter, who was 19 years old at the time of the hearing. The daughter did most of the housework, although Mattingly did some

dishes and dusted about once a month.

At the time of the hearing, Mattingly was in the process of being evicted.   She testified that she had previously applied for government housing, but had been refused.  She planned to move in with a friend.  R. 373, 380.  She was also in the process of applying for Medicaid.  She lost her Medicaid eligibility when her youngest daughter reached the age of 19.   She testified that she went to the Public Aid Office a month before the hearing to re-apply for her Medicaid coverage.   R. 373.

Myers then testified.   She testified that Mattingly's past work, such as food prep, cashier, and book binder, was light and unskilled. The ALJ then asked a series of hypothetical questions.   The ALJ asked and Myers answered as follows:

> Q.    All right.   If we would assume a hypothetical individual of Ms. Mattingly's age, education, and work experience.   And assume that the person would be limited to simple one and two-step tasks at – could perform it at a consistent pace. Would it – that – would any of the past work be able to be performed within those limitations?
>
> A.    No.
>
> Q.    Would any work?
>
> A.    Not at the competitive level.

10

Q.    Okay. All right. But limited to just simple repetitive work, would there be work that could be performed, either past work or other work?

A.    Yes.

Q.    And what would that be?

A.    The past work was light and unskilled.

Q.    Okay. And the – assume that the work, past work was not – is not relevant work as that term is defined. How many cashier jobs would there be in the – oh, in the State of Illinois and the United States or whatever geographical areas you have there?

A.    All right.   Cashier in Illinois, approximately 39,000 and nationally approximately 960,000.

Q.    All right.  What about fast food worker?

A.    Approximately 14,000 in Illinois and approximately 366,000 nationally.

Q.    Okay.  If we would add a physical limitation or a medical rather than psychiatric, let's put it that way, of no concentrated exposure to noxious fumes, gases, odors, and dust, et cetera. Would that preclude any of the past work that you described or would it reduce the availability of that type of work?

A.    No.

R. 394-96.

11

The ALJ later added another qualification to the hypothetical question

posed to Myers:

> Q.    Well, I guess if we would add to my last hypothetical that the person would be limited to work that did not require close interaction with the general public, would there be other jobs that could be performed?
>
> A.    Yes.
>
> Q.    Would the book bindery be one?
>
> A.    Yes, it would and I have the numbers for that.
>
> Q.    Okay.
>
> A.    Just a minute.  The bindery, for the State of Illinois approximately 900 jobs, nationally approximately 21,000.
>
> Q.    Okay.
>
> A.    And would you like another job?
>
> Q.    Yeah.  Would there be other work that could be –
>
> A.    Yes.
>
> Q.    – performed?
>
> A.    Production worker, approximately 18,000 jobs in the State of Illinois and approximately 355,000 nationally.
>
> Q.    Okay.

A.      And those are light, unskilled.

R. 397.

The ALJ issued his decision on June 22, 2006.  The ALJ followed the five-step analysis set forth in the Social Security Administration regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.   20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d). Such severe impairments are set forth in the Listings.  20 C.F.R. Part 404 Subpart P, Appendix 1.    The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his prior work considering his RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence  and proving  the issues on the first four steps.  The Commissioner has the burden on the last step;  the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  <u>Knight v. Chater</u>, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ determined that Mattingly met her burden at Steps 1 and 2.   He found that she was not currently working and had a severe impairment as a result of a combination of her bi-polar disorder that resulted in her depression, anxiety disorder, asthma, hypertension, and migraine headaches.

The ALJ determined that Mattingly's impairments were not severe enough to meet any of the Listings.  In doing so, the ALJ gave no weight to Dr. Sarma's opinion that Mattingly met the Listings for affective disorders and anxiety related disorders.  The ALJ wrote,

> The treating psychiatrist's opinions are entitled to little deference, because they are not well-supported by medically acceptable clinical laboratory diagnostic techniques and are

inconsistent with the conservative treatment rendered, the other acceptable medical source opinion of record, and the evidence as a whole, including the claimant's daily activities (20 CFR 416.927(d) and Social Security Ruling 96-2p).

R. 17.  The ALJ continued:

The psychiatric forms completed by Dr. Sarma indicating the claimant's affective and anxiety-related disorders meet the criteria of the listed impairments are the product of a pre-printed form questionnaire from the claimant's attorney and do not, standing alone constitute substantial evidence on the record as a whole.

R. 17-18.

The ALJ stated that Dr. Sarma did not, "articulate an objective or rational medical basis at to why the limitations checked are thought to be 'marked' and are expected to last for at least twelve consecutive months."  R. 18.   The ALJ noted that Dr. Sarma's treatment notes reported, "difficulties with concentration, persistence or pace but no inability to accomplish these needed functions adequately." R. 18.  The ALJ also noted that Mattingly left her home to take care of her needs, such as the doctor and shopping, applying for Medicaid and housing assistance, and also was able to socialize with her family. The ALJ also noted that there was no evidence that the severity of her condition  would persist for twelve months, which is required by the Listings  for  affective

disorders and anxiety related disorders.

The ALJ, rather, found that Dr. Vincent's findings of moderate limitations were consistent with the medical record and the opinions of the other health care professionals, such as Dr. Hermsmeyer, and were not inconsistent with Dr. Sarma's treatment notes. The ALJ, therefore, concluded that Mattingly's impairments imposed mild restrictions on her activities of daily living and moderate difficulties maintaining  social functioning and concentration, persistence, or pace. The ALJ found no evidence of repeated episodes of decompensation of extended duration. The ALJ concluded that these limitations imposed moderate  limitations on Mattingly's capacity to understand, remember, and carry out detailed instructions and to respond appropriately to the general public, co-workers, supervisors, or normal work stress. R. 18.

At  Step 4, the ALJ determined that Mattingly had the RFC to perform work-related activities except for:  (1) concentrated exposure to pulmonary irritants; (2) sustaining more than simple, repetitive work activity with close interaction with others, and (3) executing on more than an occasional basis the postural movements identified by Dr. Chapa (i.e., climbing, balancing, kneeling, crouching, crawling, and

16

stooping).   He then determined that she met her burden of showing that she could not perform any past relevant work.  R. 19-21.

At Step 5, the ALJ relied on Myers' opinion to find that the Commissioner met his burden to show that Mattingly could perform a substantial number of jobs in the national economy.  The ALJ found that Mattingly could perform the jobs of book binder and production worker.   The ALJ, thus, found that Mattingly was not disabled and so was not entitled to SSI.  R. 22.   Mattingly appealed, but the Appeals Council denied her request for review.  R. 4. The ALJ's decision then became the final decision of the Commissioner.  She then filed this action for judicial review.

## ANALYSIS

This Court reviews the ALJ's decision to determine whether it is supported by substantial evidence.  Substantial evidence is, "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ further must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).   The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.   Diaz  v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ's decision is supported by substantial evidence.   He determined that Mattingly had a severe impairment at Step 2, but, at Step 3, he determined that the severity of that impairment did not meet any Listing.   This finding was supported by the opinions of Drs. Vincent and Hermsmeyer.   Dr. Vincent opined that Mattingly had only moderate limitations in her ability to understand and carry out instructions and in her ability to deal with the public, co-workers, and supervisors.  The relevant Listings require findings that a person has marked limitations in these areas, and that those limitations were likely to continue for 12  months.   20 C.F.R. Part 404 Subpart P, Appendix 1, §§ 12.04 & 12.06.

The ALJ then found that Mattingly met her burden at Step 4 because she had no relevant prior work that she could perform.   At Step 5, the ALJ found that the Commissioner met his burden to show that Mattingly could perform a substantial number of jobs in

the national economy.   The testimony of the vocational expert Myers supported this conclusion.   The ALJ's decision was, thus, supported by substantial evidence.

Mattingly argues that the ALJ erred at Step 3 of the Analysis because he rejected the opinion of Mattingly's treating physician Dr. Sarma.  Dr. Sarma opined that Mattingly's condition met the requirements for the Listing for affective disorders because of her depression, and  the  Listing for  anxiety  disorders.   The opinion of a treating physician is to be given controlling weight if the opinion is well-supported by medically acceptable   clinical   and   laboratory diagnostic techniques and is not inconsistent with other substantial evidence  in  the  case  record.   20 C.F.R. § 416.927(d)(2); SSR 96-2p. The ALJ found that Dr. Sarma did not  have  any  objective  medical tests or finding to support her opinions, the opinion conflicted with the other medical opinions, and Dr. Sarma's opinion was inconsistent with Mattingly's  daily  activities.[4]   The ALJ's

---

[4]The ALJ also cited a treating note from Dr. Sarma's clinic indicating that Mattingly's prognosis was "good."  That treating note was made at Mattingly's initial visit to the clinic and was signed by Kelli Cook, B.A.  R. 250.  There is no indication that Mattingly saw Dr. Sarma on that date, or that the treating note reflected anyone's opinion other than Kelli Cook, B.A.  See R. 252 (indicating that the initial appointment with Dr. Sarma was scheduled at a later visit to the clinic).  The opinion of a person with a bachelor's degree is not an acceptable source for medical evidence. 20 C.F.R. § 404.1513(a).  The note signed by Kelli Cook, B.A., is not relevant to evaluating Dr.

findings are support by substantial evidence. Dr. Vincent only found moderate limitations in the relevant areas, not marked limitations. That opinion was supported by Dr. Hermsmeyer. Further, Mattingly interacted with her family in social settings, and she went out of the home to shop for groceries, to visit with family, and to apply for government assistance.[5] The ALJ could reasonably conclude that this level of social interaction is inconsistent with a marked limitation in social functioning. Thus, the ALJ could conclude that Dr. Sarma's opinion was inconsistent with substantial evidence in the record. As such, the ALJ's decision not to give the opinion controlling weight is supported by substantial evidence.

---

Sarma's later opinion.

[5]The ALJ also rejected Dr. Sarma's opinion because it was given at the request of Mattingly's attorney, and because it was given on a pre-printed form. R. 17. These reasons do not support the ALJ's decision. The fact that Dr. Sarma used a pre-printed form should not affect the validity of her decision; Drs. Vincent, Hermsmeyer, and Chapa used pre-printed forms, and the ALJ had no problems with their opinions. The fact that Mattingly's attorney asked for the opinion also should not affect whether it is given controlling weight. Mattingly's attorney was only gathering evidence to present to the ALJ. That is entirely proper. The Commission gathers evidence by soliciting opinions from physicians. There is nothing wrong with the claimant doing the same. None of these explanations justify the ALJ's decision to not give Dr. Sarma's opinion controlling weight. The other reasons cited by the ALJ, however (i.e., the lack of objective medical evidence, the inconsistency with the other medical evidence, and the inconsistency with Mattingly's daily activities), provide substantial evidence to support the decision.

Mattingly also argues that the ALJ's determination of her RFC was not supported by substantial evidence.    Mattingly essentially argues that the ALJ improperly rejected some of Mattingly's testimony of her limitations on daily activities.    The Court will not revisit the ALJ's credibility determinations.    The ALJ heard the evidence and cited specific activities by Mattingly that supported his findings.    Mattingly took care of her personal hygiene, performed some minor household tasks, went shopping, went to her daughter's house, and went to government offices to apply for assistance.   This level of  daily  activity supported  the  ALJ's  conclusion  that  Mattingly's  depression  was  not  so severe as to limit her ability to perform work activities.    The  RFC  finding is  supported  by  substantial  evidence.

Mattingly last argues that the ALJ's finding are against the manifest weight  of  the  evidence.   Again the Court disagrees.  Dr. Vincent found that Mattingly had slight difficulties understanding, remembering, and carrying  out  short,  simple  instructions,  and  moderate  difficulties understanding and carrying out detailed instructions and making judgments on simple work-related decisions.  Dr. Vincent also opined  that  Mattingly had moderate difficulties interacting with the public,  supervisors,  and  co-

workers; and responding appropriately to work pressures and changes in routine work settings. Those opinions are consistent with the ALJ's determination of Mattingly's RFC. The finding was not against the manifest weight of the evidence.

THEREFORE, the Commissioner's Motion for Summary Affirmance (d/e 16) is ALLOWED, and Plaintiff's Motion for Summary Judgment (d/e 12) is DENIED. The decision of the Commissioner is affirmed. Judgment is entered in favor of the Defendant Commissioner and against the Plaintiff. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER: September 20, 2007.

FOR THE COURT:


s/Charles H. Evans
CHARLES H. EVANS
United States Magistrate Judge

22